UNITED STATES DISTINCT COURT
NORTHERN DISTRICT OF NEW YORK

...............................................................

PATRICK PROCTOR,

       Plaintiff,

-against-

CHARLES F. KELLY, Jr., Correctional Captain
GEORGE SEYFERT, Deputy Inspector General;
ROBERT J. MURPHY, Acting Director, Inmate
Disciplinary Program; LUCIEN J. LeCLAIRE, Jr.,
Deputy Commissioner; GLENN S. GOORD,
Commissioner, GARY GREENE, Superintendent,

       Defendants.

...............................................................

**Jury Trial Demanded**

CIVIL RIGHTS COMPLAINT
Pursuant to 42 U.S.C. § 1983

Civil Case No.: 9:05 CV 0692 LEK/GJD

U. S. DISTRICT COURT
N. D. OF N. Y.
FILED

JUN 3 2005

AT _____ O'CLOCK ___ M
LAWRENCE K. BAERMAN, Clerk
UTICA

## Preliminary Statement

This action is a civil action filed by **PATRICK PROCTOR**, a state prisoner, for damages and injunctive relief under 42 U.S.C. § 1983, alleging violations of the due process of law in violation of the Fourteenth Amendment of the United States Constitution which resulted in the imposition of cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

## Jurisdiction

1. This Court has jurisdiction over the plaintiff's claims of violations of federal constitutional rights under 28 U.S.C. §§ 2201, 1331, and 1343 (a), (3), (4).

## Parties

2. Plaintiff PATRICK PROCTOR, is a state prisoner who is incarcerated within the New York State Department of Correctional Services (hereinafter referred to as "DOCS") at the Great

Meadow Correctional Facility (hereinafter referred to as "GMCF") during the events described in this complaint.

3. Defendant CHARLES F. KELLY, Jr., is a Correctional Captain employed by DOCS at the GMCF and, in his capacity as a Superintendent's Hearing Officer, is responsible, pursuant to 7 **NYCRR § 254, et seq.**, for conducting Superintendent Hearings and Administrative Segregation Hearings in compliance with the due process of law. Defendant Kelly is sued in his individual capacity.

4. Defendant GEORGE SEYFERT is a Deputy Inspector General employed by DOCS and, in that capacity, is responsible, pursuant to 7 **NYCRR § 254, et seq.**, for requesting the Administrative Segregation Hearing by authoring the Recommendation that subsequently resulted in petitioner being placed in Administration Segregation. Defendant Seyfert is sued in his individual capacity.

5. Defendant ROBERT J. MURPHY is employed by DOCS and, in his capacity as the Acting Director of the Inmate Disciplinary Program, he is the individual appointed by the Commissioner of DOCS who is responsible, pursuant to 7 **NYCRR § 254.8**, to insure that Superintendent Hearings and Administrative Segregation Hearings within DOCS comply with the due process of law. Defendant Murphy is sued in his individual capacity.

6. Defendant LUCIEN J. LeCLAIRE, Jr., is a Deputy Commissioner employed by DOCS. Defendant LeClaire is sued in his individual capacity

7. Defendant GLENN S. GOORD is the Commissioner of DOCS and, in that capacity, is the chief executive officer responsible for the overall supervision and administration of DOCS. Defendant Goord is sued in his individual and official capacities.

8. Defendant GARY GREENE, is the Superintendent is employed by DOCS at Great Meadow Correctional Facility and, in his capacity as Superintendent, he is responsible for the conditions of his facility and the overall supervision and administration of its Special Housing Unit. Defendant Greene is sued in his individual and official capacity.

8. All defendants have acted and continued to act under the color of state law at all times relevant to this complaint.

## Prior Court Proceedings

9. This is the <u>first</u> federal court proceeding that plaintiff has submitted in which he is directly challenging the deprivations caused by his placement in administrative segregation. Plaintiff has previously submitted a **CPLR Article 78** that challenged a disciplinary determination that was eventually reversed, with <u>all</u> references to the guilty determination allegedly expunged from his disciplinary record (see Proctor v. Coombe, 233 A.D.2d 648 [3d. Dep't 1996]); and a second **CPLR Article 78** challenging inaccurate and misleading disciplinary information that is contained within his records maintained by the Department of Correctional Services, which is currently pending before the Supreme Court of the State of New York (Albany County Index No.: 1613-05).

## Facts

10. On December 8, 2003, while housed within the GMCF, plaintiff completed his term of nine (9) years and one (1) month of confinement within the Special Housing Unit (hereinafter "SHU"); said term of SHU confinement was imposed for various disciplinary infractions, including, but not limited to escape, weapon possession, assault, fighting, etc.

11. On December 8, 2003, plaintiff was scheduled for release from SHU confinement, but, for reasons unknown to plaintiff at that time, he was not released as scheduled.

12. On December 9, 2003, plaintiff was served with an Administrative Segregation Recommendation (hereinafter "Recommendation") authored by Defendant Seyfert dated December 8, 2003.

13. In the Recommendation, defendant Seyfert listed fourteen specific allegations of misbehavior as well as other general references to allegations of misbehavior ranging over a twenty year period.

14. In concluding his Recommendation, Defendant Seyfert wrote that plaintiff "has proven himself to be not only an escape risk, but an extreme risk to the safety and security of any correctional facility, staff and other inmate he should come in contact with, within the department."

15. On December 20, 2003, defendant Kelly commenced an Administrative Segregation Hearing (hereinafter "Hearing") which, pursuant to 7 **NYCRR § 310.4(a)**, was to be held in accordance to the rules and regulations as set forth under 7 **NYCRR § 254, et seq**.

16. During the Hearing, defendant Seyfert testified, via telephone, regarding the allegations lodged in the Recommendation.

17. As part of his testimony, defendant Seyfert stated that DOCS maintains Unusual Incident Reports (hereinafter "UI Reports") even if the allegations of misconduct were dismissed at a disciplinary hearing or if the disciplinary proceeding was overturned and expunged by a court of law.

18. Defendant Seyfert testified at the Hearing that, even if plaintiff lost a portion of his leg and was crippled, Defendant Seyfert would still seek plaintiff's placement in Administrative

Segregation (hereinafter "Admin. Seg." Which, in essence, implied that plaintiff will be in Admin. Seg. For the remainder of his incarceration.

19. Additionally, Defendant Seyfert refused to concede that of the twenty-one people which were classified as either "enemies" or "separatees", several of these people were no longer within DOCS and that one of these people has passed away prior to the writing of the Recommendation.

20. Plaintiff sought to call four (4) witnesses to refute Defendant Seyfert's assertions. These witnesses were sought to substantiate many different issues regarding this hearing. For instance, how could one become a seperatee/enemy, and to introduce testimony that inmate's allegedly claim to be enemies all the time to obtain a separation so they don't get transferred to various undesirable facilities.

21. Plaintiff sought to call inmate "A. Colon" for the reasons stated in paragraph 20, as well as to further introduce testimony that he was a witness several years ago on how staff had been placing plaintiff's life in jeopardy with misrepresentations, which subsequently resulted in plaintiff having to fear for his life, which was the militating reason for plaintiff's attempt to escape from Shawangunk Correctional Facility on November 7, 1994.

22. Three (3) of the four (4) witnesses requested by plaintiff were denied because there were no longer in DOCS custody. The fourth witness, A. Colon, was denied by Defendant Kelly under the false pretext that essentially had nothing to do with why plaintiff requested him as a witness.

23. During the Hearing, Defendant Kelly failed to review the UI Reports referred to by Defendant Seyfert in the Recommendation; thereby, failing to perform any independent assessment of the credibility through reviewing the files referred to by Defendant Seyfert and by

verifying the accuracy of the information, yet relied upon this information to deny plaintiff his liberty.

24. Plaintiff alleges Defendant Kelly is using confinement in SHU under the cloak if Admin Seg to further discipline plaintiff that is clearly based upon false and inaccurate information in his institutional record that was provided by Defendant Seyfert.

25. Moreover, this false/inaccurate information will be used in a constitutionally significant way to possibly deny plaintiff parole release.

26. Plaintiff has repeatedly requested this false/inaccurate information be immediately removed for his institutional record, however, Defendant's Greene, Goord, LeClaire, Murphy, Seyfert and Kelly, have all refused to so.

27. Upon information and belief, Defendant Kelly failed to conduct the Hearing in an impartial manner as required by the due process of law because Defendant Seyfert, who authored the Recommendation against plaintiff, is superior in rank to Defendant Kelly and, as such, wields power and/or influence over Defendant Kelly due to the possibility of creating a negative influence over Defendant Kelly's career goals.

28. The basis for plaintiff's belief is that during the Hearing, Defendant Kelly stated, "I have career goals. I have to go along with the program." After which Defendant Kelly "accidentally" taped over and erased a significant large portion of the Hearing record.

29. Upon learning that a portion of the Hearing record had been destroyed by Defendant Kelly, plaintiff sought for the lost testimony to be recreated through a reconstruction of the lost testimony; however. Despite plaintiff's timely request, Defendant Kelly refused to take any sort of corrective measures to recreate the portion of the record that had been destroyed.

30. As a result of Defendant Kelly's refusal to reconstruct the portion of the Hearing record which had been lost, Defendant Kelly considered information which was not included in he hearing record in rendering a determination in this matter.

31. On December 24, 2003, Defendant Kelly concluded the Hearing by affirming the Recommendation of Defendant Seyfert and ordering plaintiff's placement in Admin. Seg.

32. On January 9, 2004, plaintiff filed an administrative appeal with Donald Selsky, Director of Special Housing, pursuant to **7 NYCRR § 254.8**.

33. On March 4, 2004, plaintiff received the determination of his administrative appeal which was rendered on March 1, 2004, by Defendant Murphy, on behalf of Defendant Goord, whereby the determination of Defendant Kelly was affirmed.

34. On March 4, 2004, plaintiff submitted a grievance complaint regarding the conditions of confinement within Admin. Seg and this grievance was assigned Grievance Number GM-35, 791-04.

35. On March 5, 2004, plaintiff submitted a grievance complaint regarding the conditions of confinement within Admin. Seg and this grievance was consolidated with his previous grievance complaint under Grievance Number GM-35, 791-04.

36. On March 24, 2004, plaintiff submitted a supplemental administrative appeal to Defendant Goord.

37. On April 6, 2004, plaintiff received the denial of his supplemental appeal by Defendant LeClaire.

38. On May 30, 2004, plaintiff wrote Defendant LeClaire and notified him of the false/inaccurate information within his institutional record.

39. On June 18, 2004, plaintiff received a response from Defendant LeClaire acknowledging receipt of said letter.

40. On May 12, 2004, CORC denied GM-35,791-04.

41. On May 31, 2004, plaintiff submitted a grievance complaint regarding the conditions of confinement within Admin. Seg that was erroneously titled "Removal from F-Block". Grievance Number GM-36,240-04.

42. On June 14, 2004, plaintiff received Grievance GM-36,240-04 back from the Grievance Office (which had been denied on June 9, 2004) and immediate wrote an "appeal statement," dated June 14m 2004, to accompany the grievance to Defendant Greene's office.

43. On June 18, 2004, Defendant Greene denied Grievance GM-36,240-04 using an erroneous excuse that did not address the feces and urine on the company almost daily and the fact that staff left the sewage there for up to a day, in an apparent attempt to engage in some sort of cruel punishment against those confined to SHU. Instead, Defendant Greene denied the grievance by concluding that plaintiff "who is presently assigned to Administration Segregation will be housed as directed by the Facility Administration to accomplish the goal of the Administration Segregation admission," which was an irrational determination, particularly in light of the fact that plaintiff did not challenge the lawful confinement of his Admin. Seg placement, but the inhumane and unsanitary conditions that he was being subjugated, too.

44. On July 21, 2004, CORC denied GM-36,240-04.

45. On July 7, 2004, plaintiff wrote a letter to Donald Selsky (Director of the Inmate Disciplinary and Special Housing Units for DOCS) concerning the deplorable conditions of the SHU at GMCF due to feces remaining on the gallery for over twelve hours which staff refusing to clean it up and to maintain a sanitary living environment.

46. No response was ever received to plaintiff's letter, dated July 7, 2004.

## *Conditions of Confinement in Admin Seg and SHU*

47. As a result of Defendant Kelly's determination rendered on December 24, 2003, plaintiff has been placed in Administrative Segregation status which has imposed a significant and atypical hardship on plaintiff.

48. At present, plaintiff has no release date and, due to the sentence which plaintiff is serving within DOCS and the statements made by Defendant Seyfert on the record at the Hearing, it appears that plaintiff will be spending the remainder of his life on Administrative Segregation status.

49. As a result of his Administrative Segregation status, plaintiff is housed in the portion of GMCF built for and reserved to house inmates on SHU status for disciplinary reasons.

50. Upon information and belief, only one percent of the prisoners housed within DOCS custody are subjugated to confinement in SHU for a period in excess of six months during their incarceration.

51. Plaintiff is confined to his cell for twenty-three hours per day with only one hour of recreation per day; said recreation occurring in a one-man cage isolated from all human contact.

52. Plaintiff is only permitted two five-minute showers per week.

53. Plaintiff is not permitted to use shaving razors, but, rather, is only permitted to use the same community "trimmers" which are used by all inmates housed in SHU.

54. Every time plaintiff leaves his cell, he is handcuffed.

55. Plaintiff is not permitted to participate in any group activity, such as religious services, programming opportunities (as required pursuant to DOCS Inmate Needs Assessment), recreational activities, etc.

56. Plaintiff has minimal personal property in his cell with no ability to receive packages or to purchase food items from the commissary.

57. Plaintiff is only permitted one nonlegal visit per week and is not permitted to use the telephone to maintain contact with family and friends.

58. Plaintiff is only permitted to receive two legal books from the law library five days per week which severely limits plaintiff's ability to properly perform legal research, prepare legal documents, and submit his legal documents to the courts in a timely fashion.

59. Plaintiff is subjected to loud banging and smelling human waste on an almost daily basis due to GMCF's policy of housing inmates on Admin Seg status in the same housing unit as the mentally ill inmates confined to SHU for disciplinary reasons.

### *Condition of Confinement in General Population*

60. Inmates confined in general population are allowed out of their cells for over twelve hours per day with numerous hours of community recreational opportunities daily.

61. Inmates confined in general population are permitted a eight minute shower every other day with some inmates (depending on their program assignment and/or housing location) being permitted daily showers.

62. Inmate confined in general population are permitted to possess three shaving razors and personal trimmers for daily hygiene maintenance and may attend the "Barber Shop" to receive a haircut monthly.

63. Inmates confined in general population are permitted to leave their cells without being placed in handcuffs and, in fact, are only handcuffed if they leave the facility on a transfer, a medical trip, etc.

64. Inmates confined in general population are permitted to participate in a variety of group activities, including but not limited to, religious services, programming opportunities, recreational activities, educational activities, dining in the mess hall, etc.

65. Inmates confined in general population are permitted to possess an unlimited amount of personal property in their cells, may receive two food packages per month, may purchase food items from the commissary twice per month, may possess a television, radio, hot pot, fan, a musical instrument, and other personal property.

66. Inmates confined in general population are permitted daily visits throughout the year, are permitted extended conjugal visits with family members multiple times per year, and are permitted to use the telephone on a daily basis to maintain contact with their families and friends.

67. Inmates confined in general population are permitted to physically attend the law library five days per week where they may have face-to-face consultations with persons trained in the law, may properly perform legal research, prepare legal documents, and submit his legal documents to the courts in a timely fashion.

68. Inmates confined in general population are not subjected to loud banging, smoke inhalation, or smelling human waste except on the rarest of occasions because, in general population, mentally ill inmates are confined in an area of the facility separated from the general population.

69. The differences between Admin Seg/SHU housing and general population housing are monumental as the loss of all human contact for such long periods of time and the subjection to mentally ill inmates has a tremendous, long-term psychological effect.

## Conditions of Confinement in Protective Custody

70. Inmates confined in Protective Custody are allowed out of their cells for several hours per day for group recreational opportunities daily.

71. Inmates confined in Protective Custody are permitted an eight minute shower every other day.

72. Inmates confined in Protective Custody are permitted to possess three shaving razors and personal trimmers for daily hygiene maintenance.

73. Inmates confined in Protective Custody are permitted to leave their cells without being placed in handcuffs and, in fact, are only handcuffed if they leave the facility on a transfer, a medical trip, etc.

74. Inmates confined in Protective Custody are permitted to participate in a variety of group activities, including but not limited to, recreational activities, etc.

75. Inmates confined in Protective Custody are permitted to possess an unlimited amount of personal property in their cells, may receive two food packages per month, may purchase food items from the commissary twice per month, may possess a television, radio, hot pot, fan, a musical instrument, and other personal property.

76. Inmates confined in Protective Custody are permitted daily visits throughout the year, are permitted extended conjugal visits with family members multiple times per year, and are permitted to use the telephone on a daily basis to maintain contact with their family and friends.

77. Inmates confined in Protective Custody are not subjected to loud banging, smoke inhalation, or smelling human waste except on the rarest of occasions because, in general population, mentally ill inmates are confined in an area of the facility separated from the general population.

78. The differences between Admin Seg/Shu housing and Protective Custody housing are monumental as the loss of all human contact for such long periods of time and the subjection to mentally ill inmates has a tremendous, long-term psychological effect.

### *Effect of Conditions of Confinement*

79. As a result of the foregoing conditions of confinement, plaintiff suffers from severe headaches, physical deterioration, anxiety, stress, depression, paranoia, delusions, and other various physical and psychological injuries.

## First Cause of Action

80. The actions of Defendant Kelly in refusing to call witnesses and to allow plaintiff to present a meaningful defense to these allegations deprived plaintiff of his constitutional right to the due process of law in violation of the Fourteenth Amendment of the United States Constitution.

## Second Cause of Action

81. The actions of Defendant Kelly in erasing the Hearing tape and in failing to reconstruct the lost testimony deprived plaintiff of his constitutional rights to the due process of law in violation of the Fourteenth Amendment of the United States Constitution and to the meaningful access to the courts for the redress of grievances in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

## Third Cause of Action

82. The actions of Defendant Kelly in failing to be an impartial Hearing Officer and placing his career goals ahead of fairness deprived plaintiff of his constitutional right to the due process of law in violation of the Fourteenth Amendment of the United States Constitution.

## Fourth Cause of Action

83. The actions of Defendant Kelly in relying on false information, in relying on expunged information, and in failing to perform an independent assessment of the information provided to him by Defendant Seyfert denied plaintiff of this constitutional right to the due process of law in violation of the Fourteenth Amendment of the United States Constitution.

## Fifth Cause of Action

84. The actions of Defendant Seyfert in providing false information and in attesting to the veracity of expunged information to which Defendant Seyfert had no direct knowledge in order to deprive plaintiff of his liberty without just cause denied plaintiff of his constitutional right to the due process of law in violation of the Fourteenth Amendment of the United States Constitution and created a significant and atypical hardship to plaintiff in violation of his right to be free from cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

## Sixth Cause of Action

85. The actions of Defendants Murphy, LeClaire, and Goord in failing to insure the preservation of plaintiff's constitutional rights by reversing, vacating, and expunging the determination of Defendant Kelly due to the numerous errors in said determination deprived plaintiff of this liberty without just cause, constituted deliberate indifference, and denied plaintiff of his constitutional right to the due process of law in violation of the Fourteenth Amendment of the United States Constitution and created a significant and atypical hardship to plaintiff in violation of this right to be free from cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

## Seventh Cause of Action

86. The actions of Defendant Greene in failing to take satisfactory protective measures to ensure and maintain humane conditions for plaintiff by condoning an unauthorized policy conducted correction officer's under his command who intentionally leave human waste on the company for up to a day at time, which repeatedly has occurred, so as to engage in some sort of cruel punishment against petitioner and other, constituted deliberate indifference, thereby depriving plaintiff Eight Amendment protections guaranteed by the United States Constitution.

## Eighth Cause of Action

87. The actions of Defendant Kelly, Seyfert, Murphy, LeClaire, and Goord in placing plaintiff in Admin Seg and housing plaintiff in SHU without just cause created a significant and atypical hardship in violation of his right to be free from cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

## Relief Requested

**WHEREFORE**, plaintiff humbly prays for this Court to:

A. Issue a Permanent Injunction which ordered Defendant Goord and his agents to:

    1. Release plaintiff from Admin Seg and place plaintiff in general population with the full restoration of all of plaintiff's rights and privileges;

    2. Expunge all references of all of the allegations mentioned in the Recommendation from all of plaintiff's institutional, department, and parole records;

    3. Prohibiting these defendants and all other present and future employees of DOCS from using any of the allegations mentioned in the Recommendation against plaintiff for any purpose at any time in the future.

B. Award compensatory damages as follows:

1. Against all of the defendants, jointly and severally, in the amount of $100 per day for each day spent in Admin Seg.

C. Award punitive damages as follows:

1. Against Defendant Kelly in the amount of $2,000,000;

2. Against Defendant Seyfert in the amount of $1,500,000;

3. Against each of the Defendants Murphy, LeClaire, Goord, and Greene, individually, in the amount of $100,000.

D. Grant such other and further relief as this Court may deem just and proper.

Dated: Comstock, New York
May 26 th, 2005

*Patrick Proctor*
PATRICK PROCTOR, Pro Se
#89 A 9763
Great Meadow Corr. Fac.
Box 51,
Comstock, New York 12821