UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

PATRICK PROCTOR,

                                        Plaintiff,


              vs.
                                                    9:05-CV-692
CHARLES F. KELLY, JR; GEORGE SEYFERT;               (J. Kahn)
ROBERT J. MURPHY; LUCIEN J. LeCLAIRE, JR.;
GLENN S. GOORD; GARY GREENE,
                                Defendants.
_____

PATRICK PROCTOR, Plaintiff *Pro Se*
BRUCE J. BOIVIN, Assistant Attorney General for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

    This matter has been referred to me for Report and Recommendation by the

Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

    In this amended civil rights complaint, plaintiff, an inmate in the custody of

the New York Department of Correctional Services ("DOCS"), challenges "the

deprivations caused by his placement in [A]dministrative [S]egregation" at Great

Meadow Correctional Facility. (Amended Complaint ("AC")[1], ¶ 9 (Dkt. No. 19)).

_____

    [1] The amended complaint is Docket Number 19.  The court will cite the amended
complaint as "AC."  Plaintiff's motion to amend was filed in September 2005.  (Dkt. No. 19).
Plaintiff's motion was granted in February 2006, and rather than requiring plaintiff to submit a
new amended complaint, the court allowed the filing of the proposed amended complaint that
was originally attached to the motion. (Dkt. No. 26).  Where the portion of the amended
complaint is easily identified by numbered paragraphs, the court will refer to the paragraph
number.  Otherwise, the court will refer to the page.

Plaintiff alleges that his due process rights were violated during the proceedings that resulted in his placement in administrative segregation and also claims that the conditions in administrative segregation violated plaintiff's right to be free from cruel and unusual punishment. *Id.* Plaintiff alleges Eighth, Fifth, and Fourteenth Amendment violations. Plaintiff seeks injunctive relief and compensatory and punitive damages. (AC at 17-18).

Presently before the court is defendants' motion for summary judgment in favor of all six defendants, pursuant to FED. R. CIV. P. 56. (Dkt. No. 93). Plaintiff opposes defendants' motion, and makes a cross-motion for summary judgment. (Dkt. No. 98). For the following reasons, this court will recommend that the defendants' motion for summary judgment be **GRANTED** in favor of all defendants and that plaintiff's cross-motion for summary judgment be **DENIED**.

## DISCUSSION

### 1.   Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86

(1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## 2.   **Facts and Contentions**

Plaintiff states that on December 8, 2003, while incarcerated at Great Meadow, he was completing a term of nine years and one month disciplinary confinement in the Special Housing Unit (SHU). (AC ¶ 10). Plaintiff states that this term of disciplinary confinement was imposed for "various disciplinary infractions, including, but not limited to escape, weapon possession, assault, fighting, etc." *Id.* More specifically, in 1994, plaintiff successfully escaped from Shawangunk Correctional Facility, using an "elaborate" plan that involved three other inmates and a parolee. Kelly Decl. Ex. C at p.2; Proctor Deposition Transcript (Pl. Dep.) at 22-23. After plaintiff was captured, he received a disciplinary penalty that included ten years of confinement in SHU. Pl. Dep. at 33.

In his complaint, plaintiff alleges that he was scheduled to be released from SHU on December 8, 2003, but was not released "as scheduled." (AC ¶ 11). Instead, plaintiff claims that on December 9, 2003, he was served with an "Administrative

Segregation Recommendation," that was written by defendant Seyfert, and dated December 8, 2003. (AC ¶ 12).

Plaintiff states that in the recommendation, defendant Seyfert listed fourteen specific allegations of misbehavior as well as other "general" allegations of misbehavior that were attributed to plaintiff over a twenty year period. (AC ¶ 13). Based upon these allegations, defendant Seyfert stated that plaintiff had proven himself to be an escape risk as well as an "extreme risk to the safety and security of any correctional facility," including inmates as well as staff. (AC ¶ 14). For these reasons, defendant Seyfert recommended that plaintiff be placed in administrative segregation, rather than released into general population at the end of his disciplinary sentence.

Defendant Kelly was assigned to conduct plaintiff's administrative segregation hearing. (AC ¶ 15). Plaintiff states that the hearing began on December 20, 2003. (AC ¶ 15). Plaintiff alleges various defects in the hearing. (AC ¶¶ 15-30). Plaintiff claims that defendant Seyfert testified falsely and relied upon outdated or incorrect information. (AC ¶¶ 17-19). Plaintiff claims that defendant Kelly improperly failed to call certain witnesses requested by plaintiff that would have refuted defendant Seyfert's testimony. (AC ¶¶ 20-22). Plaintiff claims that defendant Kelly failed to review the Unusual Incident (UI) Reports and failed to perform an "independent assessment" of their reliability. (AC ¶ 23). Plaintiff also alleges that defendant Kelly was not impartial, based his final decision on false and inaccurate information, refused to reconstruct part of the audio-taped record that was destroyed, and relied on

information that was not in the record. (AC ¶¶ 20-24, 27-31).

Plaintiff states that on December 24, 2003, defendant Kelly affirmed defendant Seyfert's recommendation and ordered plaintiff's placement in administrative segregation. (AC ¶ 31). Plaintiff appealed this decision and filed grievances regarding the alleged due process violations. (AC ¶¶ 32-40). Plaintiff claims that he has "repeatedly requested" that the allegedly false and inaccurate information relied upon by Seyfert and Kelly be removed from plaintiff's institutional record, but defendants Seyfert, Kelly, Greene, Goord, LeClaire, and Murphy have all refused to do so. (AC ¶ 26). Plaintiff alleges that this false and inaccurate information "will be used in a constitutionally significant way to possibly deny plaintiff's parole release." (AC ¶ 25). Plaintiff also claims that defendants are using administrative segregation as an excuse to further "discipline" plaintiff. (AC ¶ 24).

Separate from plaintiff's claimed due process violations regarding his placement in administrative segregation, plaintiff also claims that the conditions in administrative segregation are cruel and inhuman, violating plaintiff's constitutional rights. (AC ¶¶ 41-46). Plaintiff claims that human waste is left "on the company" for up to a day at a time. (AC ¶¶ 43-46). Plaintiff claims that "these inhuman conditions continued for months." (AC ¶ 46). Plaintiff then compares the conditions in SHU, Protective Custody, and General Population. (AC ¶¶ 47-78). Within these paragraphs, plaintiff describes the differences in privileges, property, and restrictions imposed on all three forms of confinement. *Id.*

Also within this section of the complaint, plaintiff alleges that in SHU, the

plaintiff is subjected to "loud banging and smelling human waste on an almost daily basis" due to an alleged policy of defendants Greene and Goord to house administrative segregation inmates in the same unit as "mentally ill inmates confined to SHU for disciplinary reasons." (AC ¶ 59).  Plaintiff alleges that due to the deplorable conditions in SHU, he suffers from severe headaches, physical deterioration, anxiety, stress, depression, paranoia, delusions, and other physical and psychological injuries. (AC ¶ 79).

Although the complaint contains ten causes of action, the first five are related to the alleged due process violations[2] committed by defendants Kelly and Seyfert at the administrative segregation hearing. (AC ¶¶ 80-84).  Plaintiff's sixth cause of action alleges that defendants Murphy, LeClaire, Goord, and Greene, all supervisory officials, failed to reverse defendant Kelly's determination and therefore, became liable for the due process violations allegedly committed at the hearing and for the cruel and unusual punishment allegedly suffered by plaintiff as a result. (AC ¶ 85).

Plaintiff's seventh, eighth, and ninth causes of action are related to the allegedly cruel and unusual conditions in SHU. (AC ¶¶ 86-88).  Plaintiff claims that defendants Greene and Goord failed to act upon information regarding the inhumane conditions and that defendant Goord failed to train or supervise his staff and condoned the violations after having received complaints from "prisoners." (AC ¶¶

---

[2] The court notes that within these five causes of action, plaintiff also claims that the due process violations also resulted in Eighth Amendment violations.  Plaintiff is confusing the "atypical and significant hardship" used to determine whether a liberty interest exists for due process purposes, with cruel and unusual punishment for Eighth Amendment purposes.  The court will discuss the difference below.

86-87).  Plaintiff also claims that defendants Greene and Goord authorized a "policy" of housing known severely mentally ill prisoners with "mentally healthy" inmates, knowing that these mentally ill inmates are the ones that cause the "filthy and dangerous" conditions on the unit. (AC ¶ 88).

Finally, plaintiff's tenth cause of action claims that defendants Kelly, Murphy, Seyfert, LeClaire, and Goord failed to properly maintain plaintiff's records, and used them "in an adverse way," causing plaintiff to be improperly placed and kept in administrative segregation. (AC ¶ 89).

**3.    Due Process**

In order to begin a due process analysis, the court must determine whether Plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determine whether the Defendants deprived Plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).  In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force …, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

The Court in *Sandin* determined that the inmate's discipline in segregated confinement for 30 days did not present the type of atypical, significant deprivation

in which the state might create a liberty interest. *Id.*  The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000).  In *Colon*, the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.*  The court concluded that 305 days in SHU would meet the standard. Id. at 231.  Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234.  The court also noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id.* at 231 (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)).

In this case, defendants assume for the purposes of this case that plaintiff had a liberty interest in remaining free from the potentially indefinite term of administrative confinement.  Thus, the question to be determined is whether plaintiff was afforded the process he was due prior to his placement in administrative segregation.

In *Hewitt v. Helms*, 459 U.S. 460, 469-76 (1983), the principal case discussing due process in relation to the placement in administrative segregation, the Supreme Court held that when a liberty interest is created, an inmate must be afforded procedural protections prior to being transferred into the more restrictive confinement.[3]  Under *Hewitt*, an inmate placed in administrative segregation must

---

[3] Although the standard for determining whether a liberty interest is created is now governed by *Sandin*, rather than by *Hewitt*, the standard for determining the process that is due

receive some notice of the charges and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate to administrative segregation. 459 U.S. at 476.  The constitutional requirements for placement in administrative segregation are much less strict than those that were articulated for disciplinary determinations set forth in *Wolff v. McDonnell*, 418 U.S. 539, 563-72 (1974). *See Soto v. Walker*, 44 F.3d 169, 172 n.3 (2d Cir. 1995).  In the administrative context, plaintiff would not have a federal constitutional right to have assistance for his defense, to call witnesses, or to have either a hearing or a transcript of that hearing. *See Sweet v. Wende Correctional Facility*, 514 F. Supp. 2d 411, 415 (S.D.N.Y. 2007)(even in the disciplinary context, no right to a hearing transcript); *Smart v. Goord*, 441 F. Supp. 2d 631, 641 (S.D.N.Y. 2006); *Gomez v. Coughlin*, 685 F. Supp. 1291, 1297 (S.D.N.Y. 1988)(no right to assistance, witnesses, or even the hearing itself).

Prison officials must conduct an "informal nonadversary evidentiary review" of the information supporting the inmate's administrative segregation, and this review must take place within "a reasonable time following an inmates' transfer." *Id.* at 486 & n.8. *Hewitt* also requires that there be periodic reviews after an inmate's placement in administrative segregation, such that the placement is not "a pretext" for indefinite confinement. *Id.* at 477. A "pretextual" administrative confinement may

---

after a liberty interest has been created remains the same. *See Wilkinson v. Austin*, 545 U.S. 209, 229 (2005)(stating that although *Sandin* abrogated the methodology for establishing the liberty interest articulated in *Hewitt* and in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979), those cases "remain instructive for their discussion of the appropriate level of procedural safeguards").

be raised as a separate constitutional violation. *See Soto*, 44 F.3d at 173 n.4 (citing *Hewitt*, 459 U.S. at 477 n.9). The court understands that generally, "administrative" confinement as contemplated in *Hewitt* is used for temporary confinement of an individual prior to a disciplinary hearing, at which time the individual would have the full due process protections articulated in *Wolff*. *See Hewitt*, 459 U.S. at 476 (stating that the informal review is sufficient both to determine that the inmate is a security risk and for the decision to confine the inmate "pending the completion of an investigation into misconduct charges against him).

The DOCS regulations provide that the substantive predicate for an inmate's transfer to administrative segregation is that the inmate's presence in the general population would pose a threat to the safety and security of the facility. NEW YORK CODE RULES & REGS. tit. 7, § 301.4(b)(NYCRR). The regulations also require that administrative segregation inmates receive the ***same type of hearing as those inmates who are transferred to SHU for disciplinary reasons***. 7 NYCRR 301.4(a). The hearing must take place within 14 days of the inmate's admission to SHU, after issuance of the administrative segregation recommendation "made by the employee who ascertained the facts or circumstances." *Id.*

There are several ***state law*** requirements for the hearing. The inmate must receive written notice of the reason for his confinement; he must be afforded an employee assistant if he is confined to SHU pending the hearing; the hearing officer must be impartial; the inmate must be allowed to attend the hearing; and he must be permitted to submit documents and call witnesses unless the hearing officer finds

10

that they are redundant or irrelevant. 7 NYCRR §§ 254.1, 251-4.1, 254.5, 254.6(a)(3). The hearing must be electronically recorded and must be completed within 14 days. *Id*. §§ 251-5.1(b), 254.6(b). Finally, the hearing officer must render a written decision, setting forth the basis for his determination; the inmate must receive a copy of the determination and must be told of his right to appeal. *Id*. §§ 254.7(a)(5), 254.8.

The constitutional standard for sufficiency of evidence even in the prison disciplinary context is "some" or "a modicum" of evidence to support the hearing officer's decision. *Johnson v. Goord*, 487 F. Supp. 2d 377 (S.D.N.Y. March 28, 2007)(citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)). The state law standard for sufficiency of evidence is whether the hearing officer's determination is supported by "substantial evidence." *Foster v. Coughlin*, 76 N.Y.2d 964, 563 N.Y.S.2d 728, 565 N.E.2d 477 (1990). This stricter standard is ***not*** applicable to federal due process claims, and it has been held that the reversal of a disciplinary ruling on administrative appeal for insufficient evidence does not necessarily establish a plaintiff's federal due process claim. *See Sira v. Morton*, 380 F.3d 57, 76 n.9 (2d Cir. 2004).

In this case, on December 9, 2003, plaintiff was served with an administrative segregation recommendation, written by defendant Seyfert. Kelly Decl. ¶ 8 & Ex. A, B, P. The hearing began on December 20, 2003. Defendants Kelly and Seyfert have both submitted declarations regarding the due process issues in support of defendants' motion for summary judgment. With the above due process standards in

mind, and also keeping in mind the length of plaintiff's time in restrictive confinement, the court will review plaintiff's claims that defendants did not afford him due process at his administrative segregation hearing.

### A. Seyfert Recommendation

Defendant Seyfert states that he is the former Deputy Inspector General for DOCS, and held this position from 1995 until his retirement in October of 2007. Seyfert Decl. ¶ 3.  As part of defendant Seyfert's duties, he was in charge of overseeing the DOCS Central Monitoring Case (CMC) Unit. *Id.* ¶ 4.  The CMC procedure identifies inmates who by the nature of their crime or status, require special evaluation and tracking of their movements through DOCS. *Id.* ¶ 5.  The rules governing the CMC procedure are described in the New York State regulations. N.Y. COMP. CODES R. & REGS., tit. 7, § 1000.1 *et seq.*

Plaintiff has been classified as a CMC inmate, a classification that he does not challenge in this case. Seyfert Decl. ¶ 6.  As part of defendant Seyfert's duties regarding CMC inmates, he was required to track plaintiff's movements through DOCS and evaluate plaintiff's status upon his potential release from the SHU after serving his disciplinary sentence. *Id.* ¶ 8.  Defendant Seyfert states that he was required to review the plaintiff's file and determine whether he could be safely released into the general population of Great Meadow or any other facility. *Id.* ¶ 8.

Defendant Seyfert states that plaintiff's CMC file contained all the relevant information necessary to make this determination. *Id.* ¶ 10.  These documents include an inmate's criminal history, disciplinary history, involvement in unusual incidents,

12

or any other relevant information. *Id.*

After a review of plaintiff's file, defendant Seyfert wrote the administrative segregation recommendation that was ultimately served on plaintiff. *Id.* ¶ 13.  The recommendation is attached to defendant Seyfert's declaration as Ex. A.[4]  The recommendation is dated December 8, 2003 and states first, that the reason that plaintiff was initially classified as a CMC inmate was that on February 23, 1984, he absconded from "a job search from the Edgecombe Correctional Facility." Seyfert Decl. Ex. A at 2.

Plaintiff was serving his third term of incarceration with DOCS at the time of the recommendation, and one of his convictions included another "attempted" escape. *Id.*  The recommendation then outlined various other incidents in which plaintiff was involved, including an incident in 1990 in which plaintiff slipped out of his restraints. *Id.*  Plaintiff subsequently commented to a Sergeant that he wanted to be "more famous than Willie Bosket." *Id.*  The recommendation was also based upon the 1994 escape from Shawangunk for which plaintiff was finishing his term of disciplinary confinement and the 1990 stabbing of another inmate.

The court notes that some of the incidents apparently occurred while plaintiff was in SHU.  In 1995, in the SHU of Sullivan Correctional Facility, plaintiff removed his handcuffs while confined to his cell. *Id.* at 3.  There were several other incidents in 1995, including an incident in which plaintiff set fire to his cell and an

---

[4] The court must point out that there are many duplicate exhibits in this file.  The same exhibit has often been submitted by both defendants and plaintiff.  The court will be mindful to cite to the appropriate exhibit.

incident in which plaintiff was found to have a razor secreted in his rectum. *Id.* In 1997, plaintiff stabbed another inmate in the SHU of Auburn Correctional Facility, and since 1997 had various disciplinary reports for disorderly conduct, fighting, harassment, movement violations, refusing direct orders, and violent conduct. *Id.*

Defendant Seyfert also stated that plaintiff had accumulated twenty one enemies, located at various correctional facilities. *Id.* Based on all the above information, defendant Seyfert determined that plaintiff was an escape risk as well as a risk to safety and security of ***any*** correctional facility. *Id.* Thus, defendant Seyfert recommended that plaintiff be kept in administrative segregation. *Id.* Defendant Seyfert states, however, that his recommendation is only a "recommendation," and that the final determination of administrative segregation placement is the responsibility of the hearing officer. Seyfert Decl. ¶ 15.

### B. Preliminary Procedures

The court notes that in accordance with the regulations in New York state, as stated above, plaintiff was afforded all the rights that are afforded to inmates facing disciplinary proceedings. Thus, he was afforded a substantial amount of time for notice. The recommendation was served on him on December 9, 2003, however, the hearing did not begin until December 20, 2003. He was also afforded the right to choose a hearing assistant prior to the hearing. Kelly Decl.¶ 9 & Exs. B, C. Plaintiff requested and received various documents so that he could prepare a response to the recommendation.[5] *Id.* ¶ 10 & Ex. E at 4-5. Plaintiff also requested that two witnesses

---

[5] Kelly Decl. Ex. E at 4-5 is the list of plaintiff's requested documents. Plaintiff appears to have been denied some of his requested documents as evidenced by the notation "no" next to

be interviewed, which was accomplished by plaintiff's chosen employee assistant Sergeant Nabozny. Kelly Decl. ¶ 11 & Ex. E at 3.

### C.  The Administrative Segregation Hearing

Both plaintiff and defendants have submitted a transcript of the Administrative Segregation Hearing.[6]  (Plaintiff's Ex. P-2; Kelly Decl. Ex. P)(HT)[7].  Plaintiff was present for the entire hearing.  A review of the hearing transcript shows that plaintiff was given very wide latitude and many opportunities to argue his contentions, argue oral objections to rulings; and submit written objections and summary statements.  At the outset, plaintiff was told about his rights with respect to providing oral and documentary evidence[8] and witnesses, and was also told that nothing he said could be used against him in any later criminal proceedings. (HT at 2).

Plaintiff acknowledged that he had been served on December 9, 2003 with the recommendation by George Seyfert, approximately ten days before the hearing. Plaintiff immediately asserted objections to the hearing, and argued that Captain Kelly, the Hearing Officer, was under orders by his superiors to decide against plaintiff. (HT at 7).  Plaintiff also argued that the events referred to in the Seyfert

---

the request.

[6]The hearing was conducted on several different days, but is numbered consecutively. Pages 61-66 are chronologically the final date of the hearing, but are included in the transcript out of chronological order.

[7] The court is citing to the Hearing Transcript attached to defendant Kelly's declaration.

[8] The court notes that it appears that the name of plaintiff's employee assistant was misspelled in the hearing transcript.  The document showing plaintiff's choice of assistant states that he chose Sergeant Nobozny, however the hearing transcript states that plaintiff's assistant was Deblaise. (HT at 3).  This fact is irrelevant to the decision, since it is clear that plaintiff did have an assistant assigned to him.

Memo of December 2003 were extremely old, some were thirteen years old, and some as old as nineteen years ago. (HT at 8-11).  Plaintiff also argued that the events and incidents referred to in the Seyfert Memo should not be used since plaintiff had not been issued any "tickets," and did not have an opportunity to defend those incidents at the time.  (HT 8-9, 14, 16, 36, 57, 74, 82, 83).

During the hearing, plaintiff was given the opportunity to question George Seyfert, the author of the Administrative Segregation recommendation, and Deputy Superintendent Dave Carpenter, who monitored plaintiff's mail. (T. 54-55, 68-77). Plaintiff's arguments at the hearing and during his written submissions to the Hearing Officer were that several of the events specified in the Seyfert Recommendation never happened, and for the other events, which he admitted, they did not happen as described or there were severe mitigating circumstances.

For example, plaintiff admitted to his escape from Shawangunk Correctional Facility, a maximum security facility, during November 1994. (HT at 10; Pl. Dep. at 25-33).  Plaintiff also admitted that he attempted an escape while in the custody of the Suffolk County authorities by kicking a door window, and breaking his handcuffs on a partition in the vehicle. (HT at 8; Pl. Dep. at 86-87).  Plaintiff also admitted that during June 1995, he threw feces at a corrections officer and admitted that he made a telephone call to a citizen in which he urged the citizen to tell other individuals to firebomb a house because plaintiff believed that three individuals living in the house had killed his friend. (HT at 13; Pl. Dep. at 98, 99).  *See also*, Plaintiff's Response to Defendants' Rule 7.1 Statement of Material Fact.

During the hearing and at his deposition, plaintiff admitted stabbing another inmate in February 1997. (HT at 15; Pl. Dep. at 108), but argued that the Seyfert Recommendation did not include all the facts.  Plaintiff argued that he was under attack at the time by another inmate who was attempting to cut plaintiff's face with a piece of glass, and that he was simply defending himself. (HT at 15).  Plaintiff also admitted to setting a fire during May 1997, but claimed that it was a "get warm" fire since the heat in the facility had malfunctioned, all the windows were broken, and it was freezing cold. (HT at 16; Pl. Dep. at 109).  With respect to another fire incident, plaintiff admitted that there was a fire in his cell, but argued that he had plexiglass on the front of his cell, and that guards gave him a "light" from the back of his cell, and that some papers caught fire. (Pl. Dep. at 106-107).

Plaintiff denied completely that several of the incidents in the Seyfert Recommendation actually occurred.  Plaintiff denied that he ever removed his handcuffs while in his cell in SHU during June 1995.  Plaintiff stated at the hearing that he did not recall exactly what happened, but that the staff removed his handcuffs and they were lost by staff. (HT at 12; Pl. Dep. at 93).  Plaintiff denies that he removed his handcuffs. (Pl. Dep. at 93).  Plaintiff denies that ever secreted a razor blade in his rectum. (HT at 14; Pl. Dep. at 104).  Plaintiff's own exhibits, however, contain an Unusual Incident Report which refers to x-rays being taken of plaintiff which showed the location of the razor in his rectum. (Pl. Ex. P-4)(UI dated 9/15/95).

A large portion of plaintiff's administrative segregation hearing was spent on plaintiff's challenge to his "enemy" list.  The Seyfert Recommendation refers to 21

17

enemies, and plaintiff argued that the reference to 21 enemies was erroneous.  The hearing officer accepted plaintiff's argument.  Plaintiff argued on multiple occasions that some of the individuals listed as "enemies" were, in fact, friends, or were no longer in DOCS custody. (HT at 39-43, 63, 77-81; Pl. Dep. at 111-19).

Plaintiff challenged other aspects of the Seyfert Recommendation.  Plaintiff challenged two memoranda prepared by separate sergeants on separate dates from two separate facilities.  Plaintiff argued that he was never given an opportunity to challenge the allegations in these memos, and was never charged with any type of infraction. (HT at 33).  Both sides have submitted copies of each memo, one from Sergeant Greene dated March 16, 1990, the other from Sergeant Sweeney just four days later on March 20, 1990. (Kelly Decl. Exs. M, N).

The first memo by Sergeants Greene and LaBombard to a Deputy Superintendent for Security states that plaintiff has demonstrated certain "characteristics and abilities not apparent in the average inmate." (Kelly Decl. Ex. M at 2).  According to Sergeants Greene and LaBombard, after having shackles applied, plaintiff "shook his wrists a couple of times and stepped out of his wrist chain." *Id.* The sergeants did not know how this occurred and did not rule out error by the corrections officers.  The sergeants included various comments made by plaintiff, including that it would not be hard to "get out" of the facility, and "it is like you're asking me to do something." *Id.*  The sergeants included comments the plaintiff made about distances, landmarks, and plaintiff's questions about the difference in the route to and from the hospital. *Id.*

18

The sergeants also stated that plaintiff was constantly flexing his wrists and legs, and was able to cross his legs while keeping one foot on the floor even though plaintiff was in restraints.  The sergeants stated that plaintiff made a comment about a supervisor that was outside the facility while plaintiff was being transported back to the facility in the return from a hospital visit.  Plaintiff said that he was "memorizing the license plate [of the supervisor's car] and when I see him, I'm going to fuck with him." *Id.* The sergeants concluded that "it is imperative that staff escorting this inmate never lose sight of this inmate's cunning abilities . . ."  They also stated that officers escorting this inmate must be "constantly on guard . . ." *Id.* at 2.

A second memo from Sergeant Sweeney to a First Deputy Superintendent at Clinton Correctional Facility is dated March 20, 1990. (Kelly Decl. Ex. N).  In this memo, Sergeant Sweeney stated that he heard Inmate Proctor make comments on the weapons worn by corrections officers, including the number and model of the weapons; that Inmate Proctor was very respectful and well-mannered, which "would cause staff to become complacent," and that Inmate Proctor was asking several questions about where he was going and why there was the amount of security which was present. *Id.* at 1.

Sergeant Sweeney also believed that plaintiff was "quite knowledgeable of our radio communications systems, and made numerous remarks pertaining to the system." *Id.*  Sergeant Sweeney believed that Inmate Proctor was "very attentive to his surroundings, asking many questions, and appeared to make many mental notes."

19

Sergeant Sweeney believed that Inmate Proctor would utilize any opportunity that might arise to his advantage. *Id.* at 2.

Plaintiff argued that these memoranda were unreliable and simply represented "mind reading" and speculation by the sergeants who wrote them.  He argued that no charges were brought and these two memoranda should be given little, if any, weight. (HT at 72-73).  At his deposition, plaintiff stated that he had been denied the opportunity to present four witnesses. (Pl. Dep. at 125).  Defendant Kelly gave specific reasons for that denial.  Defendant Kelly stated that three of the requested witnesses were no longer in DOCS' custody, and the fourth witness did not have any testimony that was material to the issues in the hearing.  The fourth witness was an inmate named Colon, and plaintiff wanted Colon to testify that Colon was not plaintiff's enemy.

The Hearing Officer's ruling is supported by the record since the Hearing Officer specifically corrected the "Enemies List," and reduced the number of enemies that plaintiff allegedly had.  Plaintiff specifically went through each name on the "new" Enemies List, and argued that most of those names were either not enemies, or were completely unknown to plaintiff. (HT at 79, 80).

Plaintiff has clearly admitted to several very serious crimes, all of which are extremely significant to a correctional facility.  *See* Plaintiff's Responses to Defendants' Rule 7.1 Statement; Plaintiff's Deposition (Boivin Decl. Ex. A), and Transcript of Administrative Segregation Hearing Kelly Decl. Ex. P.  Plaintiff admitted to a very sophisticated planned and successful escape from Shawangunk

20

Correctional Facility; has admitted that he escaped from Suffolk County authorities by violent behavior; has admitted that he physically assaulted two Nassau County corrections officers; has admitted that he threw feces on a New York State corrections sergeant; and has admitted that he has engaged in other violent behavior such as stabbing or assaulting other inmates.

Plaintiff attempts to minimize his extremely serious criminal and violent record by stating that he has only two escapes. (HT at 18), and that he has been well-behaved while in SHU for nine years, resulting in a reduction of his SHU sentence. Plaintiff claims that he now denounces escape and assaultive behavior, and has told Superintendent Greene of his new outlook. (HT at 19).  All of plaintiff's claims do not change the basic facts in this case of plaintiff's absconding from a facility when he was 19 years old, escaping from the Suffolk County authorities five years later, and escaping from Shawangunk Correctional Facility approximately five years after the Suffolk County escape.

By calling Deputy Superintendent Carpenter, an individual who was responsible for monitoring plaintiff's mail, plaintiff attempted to show that his mail contained no suggestions or references to escapes and therefore proves that he has no thoughts of escaping.  He also argues that he has personally "denounced" escapes and assaults and therefore everyone should realize that he does not present any risk of escape or violent behavior. (HT at 19).

### D.  Defendant Kelly

Plaintiff's first four causes of action alleges that defendant Kelly violated

plaintiff's right to due process during the administrative segregation hearing. This court has reviewed the entire hearing transcript, the exhibits attached to the Seyfert Declaration, and plaintiff's deposition. As stated above, all of the due process protections articulated in *Wolff* are not constitutionally required for placement in administrative segregation, however, in this recommendation, this court has carefully reviewed all the process that was afforded to plaintiff and finds that he received as many rights as an inmate would have received in a disciplinary hearing as required by New York State law.

In fact, this court finds that there was substantial evidence, which is more than the modicum of evidence constitutionally necessary, to support the Hearing Officer's finding that plaintiff presents an extreme risk of flight, and a risk of danger to other inmates and DOCS personnel. Plaintiff admitted most of the conduct relied upon by defendant Kelly, and defendant Kelly was justified in using plaintiff's past conduct in making his determination.

Although plaintiff complains that defendant Kelly refused to call a relevant witness, his failure to do so did not violate plaintiff's due process rights. Plaintiff states in the complaint that he wanted to call Inmate Colon "for the reasons stated in paragraph 20." (AC ¶ 21). Plaintiff also wished to call Inmate Colon so that Colon could testify that he was supposed to be a witness "several years ago," to state that corrections staff had been placing plaintiff's life in danger and that was the reason that plaintiff attempted to escape from Shawangunk in 1994. (AC ¶ 21).

By calling Inmate Colon, it appears that plaintiff was trying to justify his 1994

escape and perhaps try to show that he would not have escaped if the corrections staff had not put his "life in danger." Defendant Kelly's written reason for the denial of this witness was that Inmate Colon was listed as a "separatee". (Kelly Decl. Ex. G; HT at 64). Plaintiff claims that the refusal to call Inmate Colon had nothing to do with the reason that plaintiff wanted to call the inmate. (AC ¶ 22). Since plaintiff would not constitutionally have been entitled to witnesses at all, defendant Kelly's denial of Inmate Colon would not have been constitutionally relevant even if the reason was incorrect.

However, the court notes that plaintiff would not have been able to rehash the reasons for his attempted escape in 1994. If his reason for calling Inmate Colon was to justify plaintiff's attempted escape to show that he was no longer an escape risk, such testimony would have been properly denied in any event. The court notes that if calling Inmate Colon was an attempt to prove that plaintiff's enemies list was incorrect, defendant Kelly went over plaintiff's enemies list at the hearing and considered plaintiff's claim that the list was outdated. (HT at 76-80). In fact, defendant Kelly told plaintiff that he would consider some individuals only as "on the separation list" as opposed to being plaintiff's "enemies." (HT at 84-86). It is also clear that defendant Kelly accepted and considered evidence submitted by plaintiff. (HT at 83-84).

Notwithstanding defendant Kelly's failure to call Inmate Colon, it is clear that plaintiff was able to present a defense to the recommendation. Plaintiff claims that defendant Kelly was not "impartial." Compl. ¶ 82. It is true that an inmate is entitled

23

to an "impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996).

An "impartial" hearing officer is one who does not prejudice the evidence, and who

could not say how he would assess evidence that he has not seen. *Patterson v.*

*Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990).  The court would point out, however,

that disciplinary hearing officers are not held to the same standard of neutrality as

adjudicators in other contexts based on the "special characteristics" of the prison

environment. *Allen*, 100 F.3d at 259; *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.

1989)(it is permissible for prison adjudicators to be encumbered by various conflicts

of interest).

A careful review of the entire file shows that there is absolutely no evidence

that defendant Kelly was not impartial.  He conducted an exhaustive hearing,

listening to plaintiff's defense, and when plaintiff challenged his enemies list,

defendant Kelly did look into the matter, and agreed to consider plaintiff's position.

*See generally* Hearing Transcript. *See also* Kelly Decl. ¶¶ 13-17.  The record shows

that defendant Kelly proceeded very deliberately and patiently, and gave plaintiff

great latitude in allowing plaintiff to assert all of plaintiff's arguments and

objections.  He asked for two or three extensions to complete the hearing because of

the issues raised and the time necessary for plaintiff to fully present all of his

arguments, claims, theories, and excuses.

With respect to the claim that defendant Kelly was directed to reach a certain

result, the declaration of defendant Seyfert clearly shows that this was not the case.

Defendant Seyfert states in his declaration that he is not defendant Kelly's superior

had no contact with defendant Kelly other than the telephonic testimony that defendant Seyfert provided at the hearing. Seyfert Decl. ¶¶ 39-44.  Thus, defendant Kelly's impartiality cannot be questioned through a claim that defendant Seyfert was somehow defendant Kelly's superior, causing an impermissible conflict of interest.

Plaintiff also complains that defendant Kelly's refusal to reconstruct testimony after erasing part of the hearing tape somehow violated plaintiff's due process rights. The court would simply point out, as stated above, that an electronic recording of a hearing is not constitutionally required, and there is no constitutional right to a transcript even in the disciplinary context. *See Sweet*, 514 F. Supp. 2d at 415(even in the disciplinary context, no right to a hearing transcript).  Thus, even if defendant Kelly did erase part of the hearing tape and refused to "reconstruct" the testimony, there is no due process violation.

Finally, plaintiff claims that defendant Kelly relied upon false, expunged information in accepting defendant Seyfert's recommendation.  Plaintiff also alleges that defendant Kelly failed to make an "independent assessment" of the information. Plaintiff is confusing the law that governs due process claims.  The requirement of an "independent assessment" refers to a hearing officer being required to make an independent assessment of "confidential information" that he receives during a disciplinary hearing. *See Sira v. Morton*, 380 F.3d 57, 77 (2d Cir. 2004).  There was no confidential information relied upon by defendant Kelly in this case, thus, defendant Kelly did not have to make an "independent assessment" of the information utilized.  Defendant Kelly did make an "independent assessment" of all

the evidence when he considered the plaintiff's testimony and other evidence and defendant Seyfert's evidence and testimony. This was the "independent assessment" required of the hearing officer.

To the extent that plaintiff claims that defendant Kelly relied upon "false and expunged" information, it is unclear to what plaintiff is referring. Plaintiff has argued that he was never given misbehavior reports or "charged" with some of the conduct that was used against him. The fact that plaintiff was not "charged" with misbehavior does not indicate that the conduct did not occur. Plaintiff states that defendant Seyfert testified that UI reports are kept even if the allegations of misconduct were overturned and expunged. Defendant Seyfert did make that statement. (HT at 69). To the extent that UI reports were considered where misbehavior reports were not issued, the court does not find any error in their use.

There is one UI report in plaintiff's case that did result in a misbehavior report and subsequent disciplinary conviction. The incident involved a 1995 charge for contraband in the form of a sharpened nail clipper. Plaintiff later had the charges reversed and expunged.[9] *Proctor v. Coombe*, 233 A.D.2d 648, 649 N.Y.S.2d 832 (3d Dep't 1996). After the UI from this incident was considered in this administrative segregation proceeding, plaintiff brought a proceeding pursuant to 7 N.Y.C.R.R. § 5.51 to expunge *all* references to this incident from his prison record. When the Superintendent denied plaintiff's request, he filed an Article 78 proceeding in Supreme Court of Albany County. *Proctor v. Goord*, 10 Misc. 3d 229, 801 N.Y.S.2d

_____

[9] The court does note that the charges were "administratively reversed," causing the Appellate Division to dismiss the Article 78 proceeding as moot. *Proctor v. Coombe, supra.*

26

517 (Sup. Ct. 2005).

The Supreme Court in Albany County found that because the UI resulted in a misbehavior report and a disciplinary determination that was later expunged, the court found that all references to the UI in plaintiff's record should have been expunged. *Id.* 3 Misc. 2d at 232-33, 801 N.Y.S.2d at 519-20. The court held only that references to the UI from the expunged determination should be removed from plaintiff's record. There is no indication, and this court finds none, that the other UI's in which no misbehavior was charged were false or improperly considered.

The Second Circuit has specifically held that prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991). To the extent that defendant Kelly considered[10] the one incident involving the nail clipper, the court still finds that no due process violation occurred. Plaintiff had the opportunity to, and did, argue that it should not be considered. If it was error, the error was certainly not "prejudicial" to plaintiff. There were so many other incidents upon which defendant Kelly could base his decision. As stated above, the standard for administrative segregation is "some" or "a modicum" of evidence. Even if the court were to assume that defendant Kelly erred in considering

---

[10] The court notes that at the hearing, when plaintiff was responding to each of the allegations in the report, he merely stated that this incident "never happened. . . . that's all I am going to say about that." (HT at 13). He later argued that he was found "innocent" of the charges and the records were expunged. (HT at 36-37). Plaintiff questioned why the information was being used against him. *Id.* Plaintiff did have the opportunity to argue that defendant Kelly should not consider the information. Plaintiff and the hearing officer had a lengthy discussion about incidents that did not result in misbehavior reports. (HT at 52-54). The hearing occurred in 2003, and the Supreme Court's decision stating that the information should have been expunged occurred in 2005.

the UI, and even if that error could rise to the level of a constitutional error,[11] the court would find the error harmless.

### E. Defendant Seyfert

Plaintiff has named George Seyfert, who was formerly the Deputy Inspector General of DOCS.  Plaintiff claims that defendant Seyfert provided false information and "attested to the veracity of expunged information."  Plaintiff claims, in essence, that defendant Seyfert used incomplete and erroneous information when Seyfert compiled the administrative segregation recommendation.  Throughout the hearing, plaintiff claimed that Seyfert relied on an erroneous list of plaintiff's "enemies" and also relied on the two memos from correctional sergeants that made statements about plaintiff's actions and state of mind.  Plaintiff also argues that Seyfert relied on Unusual Incident Reports, one of which was expunged from plaintiff's records (the nail clipper incident), and others which did not result in Misbehavior Reports. Plaintiff claims, in essence, that he was denied due process since the Unusual Incident Reports did not result in charges, and he was not able to challenge the facts and statements in the Unusual Incident Reports.

The court would point out that inmates are not constitutionally protected from false accusations as long as the hearing comports with due process. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988).  In this case, the court has determined that plaintiff had more than the constitutionally required due process at his hearing, thus, plaintiff's claims of false accusations

---

[11] The court makes no such finding in this case.

against defendant Seyfert cannot stand.

Notwithstanding this finding, the court must note that plaintiff's claims of *false* accusations ring hollow. The plaintiff began the hearing by admitting most of the conduct that was in the recommendation. Plaintiff's claims of "false" evidence are basically his interpretation of how the incidents happened. Even the UI that the Supreme Court in Albany County ordered expunged was not necessarily "false." The court simply ruled that because the misbehavior charge was reversed and ordered to be expunged, the incident could not be considered. No court ruled that the allegations were "false."

Plaintiff admitted at the administrative segregation hearing, during his deposition, and in his Response to Defendants' Statement of Material Facts in Support of the Summary Judgment Motion, that he escaped from Shawangunk; escaped from Nassau County authorities; admitted the two assaults, but claimed they were self-defense; admitted one of the "arson" incidents, admitted squirting feces onto a corrections officer; and admitted receiving disciplinary reports for disorderly conduct, fighting, harassment, and a movement violation. Thus, plaintiff's claims against defendant Seyfert may be dismissed.

### F. Defendants Goord, Greene, Murphy, and LeClaire

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)(citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319,

323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

In plaintiff's sixth cause of action he claims that defendants Murphy, LeClaire, Goord, and Greene violated plaintiff's right to due process by failing to reverse defendant Kelly's determination. Compl. ¶ 85. In plaintiff's tenth cause of action, he states that defendants Kelly, Murphy, Seyfert, LeClaire, and Goord failed to maintain plaintiff's disciplinary records accurately and thus, relied upon false and inaccurate unusual incident records. Compl. ¶ 89. As stated above, only one of the unusual incident records was expunged. There is no indication that any of them were "false."

Since there has been no showing of a constitutional violation, to the extent that plaintiff alleges that the supervisory officers, Murphy, LeClaire, and Goord and Greene affirmed plaintiff's administrative segregation placement, there is also no

30

constitutional violation.  Additionally, there is *no indication* that defendants Murphy or Goord were personally involved in plaintiff's appeal or in the maintenance of plaintiff's records.  Defendant Kelly was only the hearing officer in this case.  There is no indication that he was in any way involved in the maintenance of plaintiff's records.

In his amended complaint, plaintiff states that defendant Murphy is the Acting Director of the Inmate Disciplinary Program, whose "responsibility" it is to make sure that disciplinary and administrative segregation hearings comply with the law. However, there are no specific claims against this individual.  Thus, there is no personal responsibility asserted for defendant Murphy.

Plaintiff has submitted a letter that he received from defendant LeClaire, stating that notwithstanding the questioned UI report, there was other evidence showing that plaintiff's placement in administrative segregation was proper. Pl. Ex. P-15 at 4.  Even assuming that this letter would make defendant LeClaire personally responsible in some way for the "affirmance" of plaintiff's administrative segregation status, the letter shows that defendant LeClaire believed that plaintiff's placement in administrative segregation was proper, notwithstanding the allegedly inaccurate or "false" UI outlining the nail clipper incident. *Id.*  Thus, as stated above, this UI was not the only basis for plaintiff's placement in administrative segregation, and defendants did not rely on "false" evidence.

This court has examined the Declaration by former DOCS Commissioner Goord in support of defendants' motion for summary judgment. Goord Decl. (Dkt.

No. 39). The Declaration is detailed and shows that former Commissioner Goord was required to delegate many separate duties because of the vast number of inmates and the large number of correctional facilities. Goord Decl. ¶¶ 7-10. Commissioner Goord confirms that he was never personally involved in the administrative segregation hearing, the appeals therefrom, or the grievances filed by plaintiff regarding the allegedly inhumane conditions in SHU. Goord Decl. ¶¶ 34-44, 58.

With respect to maintenance of records, defendant Goord states that DOCS tries to maintain inmate records accurately. Goord ¶ 62. If an inmate questions the accuracy of his records, he may file a challenge under 7 N.Y.C.R.R. § 5.50.[12] Defendant Goord states that he did not have any involvement in this procedure. Goord Decl. ¶ 62-64. Plaintiff makes no allegation that defendant Goord had any responsibility for any of the allegations that plaintiff makes. Basically defendant Goord is named in the complaint because he was the Commissioner of DOCS. As stated above, this essentially *respondeat superior* claim cannot survive. This court recommends, therefore, that Commissioner Goord be dismissed from this lawsuit.

The court has examined the Declaration by Superintendent Greene and all of the other records in this case, and finds that Superintendent Greene did not violate any of plaintiff's due process rights with respect to plaintiff's administrative segregation hearing. Superintendent Greene's statement that his only role in the administrative segregation determination was the assignment of Captain Kelly to conduct the hearing is supported by the records in this case.

---

[12] As stated above, plaintiff did challenge the **one** expunged misbehavior report and UI record and won in the Supreme Court. Plaintiff did not later challenge his "enemies" list.

Superintendent Greene was *not* personally involved in the recommendation to put plaintiff into administrative segregation, was not personally involved in the hearing, and was not personally involved in the decision or the appeal.  In addition, Superintendent Greene does not maintain inmate records, and has no responsibility for any incomplete or missing records pertaining to the plaintiff. Greene Decl. ¶ 29. Defendant Greene states that inmate records are kept by the Central Office. *Id.*  Thus plaintiff's due process claims may be dismissed as against defendant Greene.

**G.  Periodic Reviews**

In plaintiff's cross-motion for summary judgment, he *now* appears to be complaining about the periodic reviews that occur every sixty days when an individual is confined to administrative segregation. Pl. Mem. of Law at 10, 27-28. (Dkt. No. 98).  It is true that in addition to the notice and opportunity to be heard prior to placement in administrative segregation, an inmate must be given periodic reviews of his confinement so that administrative segregation is not used for indefinite confinement of the inmate. *Hewitt*, 459 U.S. at 477 n.9.  Those periodic reviews must be meaningful. *See Doe v. Simon*, 221 F.3d 137, 139 (2d Cir. 2000). The question of periodic review is a due process claim that is separate from the claim for the initial placement in administrative segregation. *See Blake v. Coughlin*, 92-CV-1351, 2006 U.S. Dist. LEXIS 55319, *14-17 (N.D.N.Y. Aug. 8, 2006).

Plaintiff's motion for summary judgment, filed in 2008, is the ***first time*** in this case that plaintiff is complaining about his periodic reviews.  There is absolutely *no* mention of periodic reviews in his amended complaint that was initially submitted as

a motion to amend on September 8, 2005.  Since plaintiff was placed in

administrative segregation in 2003, by September of 2005, there would have been

many of those periodic reviews to challenge if plaintiff wished to do so. Defendants

are correct in arguing that the constitutionality of plaintiff's periodic reviews is not

before the court.

## 4.    Conditions in SHU

Plaintiff alleges that the conditions in SHU violated his right to be free from

cruel and unusual punishment.  Plaintiff's seventh, eighth, and ninth causes of action

refer to these allegedly inhumane conditions.  The Eighth Amendment does not

mandate comfortable prisons, but does guarantee that the conditions in prison will be

at least humane. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001).  In order to

establish an Eighth Amendment violation, plaintiff must show that the deprivation

was objectively, sufficiently serious to deprive plaintiff of the minimal civilized

measure of life's necessities, and must show a sufficiently culpable state of mind on

the part of defendant. *Id.*  That state of mind component is satisfied if defendant has

shown deliberate indifference to plaintiff's health or safety. *Id.* (citations omitted).

Plaintiff has submitted many grievances from other inmates that plaintiff

believes support his claims that the conditions in SHU violated the Eighth

Amendment ban against cruel and unusual punishment.  Many of the exhibits show

specific investigations and statements by sergeants in response to grievances.  In one

of plaintiff's exhibits, Sergeant Birrell filed a report stating that no inmates around

the grieving inmate were plastering their walls with feces. Pl. Ex. P-21.  In another of

plaintiff's exhibits, Sergeant Birrell stated that his investigation did not verify flooding of an inmate's cell. Pl. Ex. P-22.  In another response, Sergeant Murray stated that the inmate could request that mental health personnel examine him. Pl, Ex. P-24.  *See also* Pl. Exs. P-25, P-26, P-28.

In his Eighth Amendment claims, plaintiff has named only supervisory personnel, defendants Greene and Goord.  Plaintiff complains about two specific problems in SHU, human waste being left on the gallery, and mentally ill inmates. There is no indication that defendant Goord was involved in any of the grievances submitted by plaintiff or any other inmate.  Defendant Goord was not at Great Meadow Correctional Facility.  His office was in Albany, and he supervised the entire DOCS system. Goord Decl. ¶ 7.

As defendant Goord states in his declaration, he was ***not*** involved in grievances since they are handled through the Inmate Grievance Program in 7 N.Y.C.R.R. § 701, *et seq.* Goord Decl. ¶¶ 40-43.  The court would also point out that even if defendant Goord had ignored letters of protest, this would not have made him personally responsible for the violations outlined in those letters. *Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006).  The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation. *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.*, 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007).

Plaintiff's bald assertion that defendant Goord condoned a policy of inhumane conditions in Great Meadow's SHU is completely unsupported by plaintiff's

35

complaint or any of the multitude of exhibits[13] attached to his summary judgment motion.

Defendant Greene is the superintendent of Great Meadow.  Defendants claim that there is no policy of condoning such behavior in SHU.  Although plaintiff claims that mentally ill inmates are housed in SHU, and ***those mentally ill inmates*** are generally responsible for the human waste and noise problem, plaintiff seems to forget that he admitted placing feces in a toothpaste tube while in he was in SHU and squirting it onto a corrections officer.  Plaintiff stated at his administrative segregation hearing that he understood that it was poor judgment, however, other inmates who are not mentally ill could exercise the same "poor judgment."

Defendant Greene states that unfortunately, there are instances in which inmates throw things,[14] flood their cells, start fires, and engage in generally unruly behavior. Greene Decl. ¶ 37.  According to defendant Greene, and to the individuals who investigated the grievances cited above, these instances of improper behavior

---

[13] Plaintiff has submitted 45 exhibits in support of his summary judgment motion. Pl. Exs. 1-45 (Dkt. No. 98).  Some of them are duplicates of the defendants exhibits, such as the administrative hearing transcript and the two sergeants' memoranda. Pl. Exs. 1-3, 8.  However, plaintiff's exhibits contain letters written by plaintiff to various officials. Pl. Exs. P-11-11-12, 14-15, 22-23.  Some of the exhibits are grievances by other inmates regarding the conditions in SHU. Pl. Exs. 24-36.  Other exhibits consist of newspaper articles discussing the confinement of mentally ill inmates as well as excerpts from other writings regarding correctional facilities. Pl. Exs. 39-41, 42-44.  Plaintiff also submits a handwritten affidavit from an individual, stating that he believes plaintiff's statements to be accurate. Pl. Ex. 45.  The court has reviewed and considered all of plaintiff's exhibits in conjunction with defendants' motion and plaintiff's cross-motion for summary judgment.

[14] At one time, plaintiff also had a plexiglass shield placed over his cell.  These shields are generally used when an inmate throws materials (feces or otherwise) out of his cell.  Thus, it appears that "mentally ill" inmates are not only those that cause problems in the SHU.

are dealt with "appropriately." Greene Decl. ¶ 38.  It is clear from plaintiff's own exhibits that the subjects of these grievances were addressed.  Although plaintiff complains that the SHU houses "mentally ill" inmates, plaintiff's opinion of whether an inmate is mentally ill does not raise a question of fact regarding this issue, particularly since plaintiff himself has engaged in some of the "offensive" behavior.

Plaintiff has not alleged that he was denied the minimal civilized measure of life's necessities, he has alleged that he has had to suffer some unpleasant conditions caused by other inmates.  The court would point out that in some of plaintiff's exhibits, the investigation into the grievance shows that the statements in the grievance were unsubstantiated.  In response to a grievance stating that an inmate's jumpsuit was soiled by flooding, Sergeant Birrell reported that the jumpsuit was neither wet, nor soiled. *See*  Pl. Ex. P-22 at 5.

Plaintiff has also submitted an SHU log for various dates. Pl. Ex. P-16.[15]  A review of the log entries shows that generally the officers handled issues very quickly.  The court also notes that there are notations that MHU (mental health unit) personnel made rounds frequently. *See e.g.* Pl. Ex. P-16 at 6, 9, 11, 14.  The court would also point out that there is no indication that an individual who needs a mental health professional is "mentally ill."  There are incidents of "banging" on the cells,[16] however, these appear to occur on an occasional basis.

_____

[15] The pages of plaintiff's Ex. P-16 are numbered in various places, but it appears that plaintiff has numbered the pages consecutively at the bottom right, and the court will cite to those page numbers.

[16] *See e.g.* Pl. Ex. P-16 at 78, 88.

Plaintiff filed a grievance, alleging that on May 31, 2004, an inmate flooded his toilet.  Plaintiff himself states that a porter was mopping up the area at 2:00 p.m., but also states that at 11:30 p.m., the inmate in question had not been given the opportunity to clean his cell. Pl. Ex. P-23.  A review of the log book entries shows that an inmate was throwing toilet water and feces on the floor at 12:55 p.m. and at 1:35 p.m. Pl. Ex. P-16 at 24.  If plaintiff claims that the porter was cleaning the area at 2:00 p.m., this does not support his claims that this condition was allowed to exist for the entire day.  Additionally, the court notes that the log book also shows that by 2:18 p.m., an inmate plumber was trying to unclog the toilet, and by 2:35 p.m., the toilet was "flushable." *Id.* at p.24.

The court also notes that between May 9, 2004 and May 13, 2004, there was a plumber on the unit at least twice. Pl. Ex. P-16 at 14-16.  On May 27, 2004, another individual was on the unit to fix and clean an inmate's toilet. *Id.* at 22.  Shortly thereafter, a porter was "out to clean." *Id.*  On one day, at 11:03, an inmate was observed throwing feces and water out of his cell and covering the plexiglass on the front of his cell with an unknown substance. Pl. Ex. P-16 at 26.  The log book notes that a supervisor was "notified" immediately, and at 11:52, maintenance was called. At 11:55, the MHU was on the unit to attempt to "extract" the inmate. *Id.*  On another day, the log book indicates that at 9:17 a.m. someone was "out cleaning the mess on odd side of F-Block." *Id.* at 34.  At 10:15 a.m. C.O. Depalo came to take an inmate out of his cell "to clean cell," and the "cell extraction protocol" was in progress. *Id.*

38

On July 11, 2004, an inmate kept his food tray and was yelling and banging for approximately one hour. *Id.* at 68. The reason for the banging, however, was that his eye was bothering him, and the officer called the nurse, who informed him that the physician's assistant would check the inmate's eye on evening rounds. *Id.* There was some more "banging and hollering" noted for approximately one half hour on July 14, 2004. *Id.* at 73. On July 14, 2004, at 7:40 a.m., the officer noted that an inmate had smeared feces on the plexiglass covering the door of his cell and covered the door with paper. *Id.* at 72. At approximately 12:46 p.m., the plexiglass was being removed from a cell to clean the door and the bars. *Id.* at 75. At 2:00 p.m., the cell[17] was "completely clean" and the plexiglass was placed back on the cell. *Id.*

The court will not discuss every entry in the log book and what it states, and the court does note that there are other instances of improper behavior noted in the log book.[18] In the entries cited, however, the hygiene issues were all addressed quickly, and the area cleaned within a short period of time. When there were plumbing issues on the unit, these too were addressed. These examples are only to indicate that plaintiff's conclusory assertions that there is some kind of "policy" to allow unhygienic conditions, caused by mentally ill or other inmates to exist on the SHU, or that defendants Greene and Goord condoned such behavior are meritless.

**WHEREFORE** it is hereby

---

[17] The court is assuming that this is the same cell, although the names of the inmates have been "blacked-out" from the log entries.

[18] Plaintiff did not include all the pages from each day in this exhibit. The pages appear to also be stamped with numbers at the top right hand corner of the page. These numbers are not always consecutive, indicating that there are pages missing.

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 93) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS**, and it is

**RECOMMENDED**, that plaintiff's cross-motion for summary judgment (Dkt. No. 98) be **DENIED**.

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 30, 2008

Hon. Gustave J. DiBianco
U.S. Magistrate Judge

40